We will hear argument this morning in Case 24-856, Cisco Systems v. Doe. Mr. Shammagam? Thank you, Mr. Chief Justice, and may it please the Court. Aiding and abetting liability constitutes a significant expansion of a civil cause of action. For that reason, this Court has made clear that it is generally not available absent clear congressional direction. The ATS contains no express cause of action at all, and the TVPA's cause of action contains no language that provides for aiding and abetting. And recognizing such a cause of action would raise substantial foreign policy concerns, as in this case, which involves serious allegations of wrongdoing in a foreign country by a foreign government. It is for Congress, not for this Court, to provide for aiding and abetting liability under these statutes, and it has not done so. As to the ATS, respondents primarily rely on SOSA, which left open the possibility that courts could recognize new causes of action drawn from modern international law under the ATS. In light of this Court's most recent cases concerning implied causes of action, the Court should take this opportunity to clarify that implying new causes of action under the ATS is impermissible. But even under SOSA, it would not be a proper exercise of judicial discretion to recognize a categorical cause of action for aiding and abetting. Under Central Bank, Congress's silence is sufficient to foreclose that cause of action. And such a cause of action would pose grave harms to foreign policy and the separation of powers, as the government's brief confirms. The Court has never created a new cause of action under the ATS, and this should not be the first. As to the TVPA, the analysis is straightforward. The statute contains no language mentioning aiding, abetting, assisting, facilitating, or otherwise participating in another's conduct. To be sure, the statute imposes liability on a person who subjects the victim to torture. But that verb recognizes one specific type of secondary liability, command liability for an officer responsible for the individual who inflicts the torture. As a matter of plain text, but especially under Central Bank, the TVPA does not provide for aiding and abetting liability either. Accordingly, the judgment of the Court of Appeals should be reversed. I welcome the Court's questions. Can you think of any cause of action that SOSA would permit? We believe that SOSA permits two types of causes of action. First, a cause of action for the three core offenses contemplated by the first Congress. I think that that is common ground, and that was common ground even in SOSA itself. Second, and importantly, any cause of action subsequently recognized by Congress. And we know from the TVPA that Congress can recognize causes of action for additional norms if it chooses to do so. Congress did so for two additional norms, torture and extrajudicial killing in the TVPA. In our view, that understanding of SOSA respects the intent of the Congress that enacted the Alien Tort Statute. After all, in SOSA itself, the Court recognized that the ATS in terms is only a jurisdictional statute, but to avoid it being a dead letter, the Court recognized these two additional categories. Mr. Chamigan, can I just invite you to think about whether or not aiding and abetting liability is actually a significant expansion, as you said in your opening statement. What is your view as to whether or not aiding and abetting liability is available for the Blackstone III that I think you agree are in the ATS? Yes, so our view is that there is insufficient historical evidence even as to those three, and I won't belabor it unless you would like me to. We go through in the reply brief the sources relied upon by my friend on the other side. But I think beyond that, we think that the right way to think about those three core offenses is that you would still need to conduct the analysis at Step 2 of SOSA, and I think that under that analysis, many if not all of the arguments that we're making as to why it would be an improper exercise of judicial discretion would apply in that context as well. But wouldn't you be doing it in that case on a case-by-case basis? I mean, I'm wondering about your argument insofar as it does seem to be grounded in the view that aiding and abetting liability is like a separate cause of action as opposed to just an expansion of the types of defendants who can be held liable for this underlying conduct. And so, I mean, I'm sure that your friends on the other side will point to evidence that even Blackstone thought that aiding and abetting piracy or aiding and abetting the other Blackstone-established core violations was allowed under international law, and I don't understand why they would be precluded as an expansion somehow of those core violations. Two points in response to that, Justice Jackson. First, I think it's a fair point that you could conceptualize this not as a separate cause of action but as a question concerning the scope of the cause of action. I don't think anything really depends on that. I think that we think that the analysis should be the same either way. And indeed, I think Justice Sotomayor's dissent in Jesner supports our view because to the extent that she construed footnote 20 of SOSA to suggest that you still take domestic law into account when analyzing these questions about the available defendants, we would obviously point to central bank. But second, and I think that this is directly responsive to the question of what to do about the three core offenses, I think that the court could, if it so chose, simply draw a line around those three core offenses and say that whatever the historical evidence on those three core offenses, that evidence does not support recognition of aiding and abetting liability across the board. And respondents are really advocating for categorical- which is why? Why draw the line between the core offenses and aiding and abetting as opposed to the core offenses and other types of offenses? I don't understand the line that you would have us draw. I think because the approach that you're hinting toward would run directly into central bank, and let me explain why. We think the right way to think about the first step, and of course we're not really disputing the first step here, but let me engage on that directly. We think that if you were analyzing this under the first step, you would have to engage in a norm-by-norm analysis. Namely, you would have to look to whether or not for any particular norm aiding and abetting liability is available. But I don't think you can extrapolate from the smattering of historical evidence concerning the three core offenses that aiding and abetting liability was generally available in civil cases at the time of the incident. It's not, Mr. Shammigan, but I guess the question is, why might it not be available sometimes? In other words, neither categorical rule is right, but instead it's a norm-by-norm inquiry in much the way that Judge Bumate suggested in his Ninth Circuit opinion. Why wouldn't that be the right way to look at it? And it could, as he suggested, even within the three Blackstone offenses, the evidence for aiding and abetting liability is quite different. It may be strongest in piracy, and then there is some questions about the other two. So, as you will be aware, Justice Kagan, if you take a look at the complaint, pages 100 to 101 of the Joint Appendix, there are seven separate primary norms on which respondents are relying here. Now, respondents, to the extent that they make an argument under Step 1, make no effort to disaggregate those norms and engage in the sort of norm-by-norm analysis that you suggest. They've gone all or nothing, and they've done that throughout this litigation, so I don't think that they should be given a second bite at the apple. Their argument is for a categorical norm of aiding and abetting liability. And I do think that the best evidence as to why this Court should be precise about this is actually a law that was enacted a year after the ATS, the Crimes Act of 1790, when Congress, when it was defining criminal liability, made aiding and abetting available for piracy, but not for the other two of the three core offenses. And so all of which is to say that there should be norm-by-norm rigor, in our view, in this analysis. But I would say one further thing that I think is very important. I'm sorry, that there should be, because I was planning on asking your friend the same question, because it seems to me that both of you fall into this, he urges one categorical rule, you urge another categorical rule, and what I might be suggesting is that neither of those categorical rules is appropriate, that you have to look norm-by-norm. Of course, this case is quite odd, because you're not contesting whether any of these seven things that are listed in the complaint are norms under the ATS, and we're being referred only to this broad aiding and abetting question when the more natural way of thinking about these questions are like, take a look at the norm, is the norm covered first, and if the norm is covered, what's the scope of liability, secondary liability that's attached to that norm? Two responses to that, Justice Kagan. First, if the court accepts our first-order submission that the court should shut the door that it left open in SOSA, then the norm-by-norm analysis obviously falls out of the equation. Those primary norms are not actionable a fortiori, no secondary liability. But second, and I think importantly, if you don't agree with that, and we are in SOSA world, at the second step of the analysis, I actually don't think that the second step requires a norm-by-norm analysis here, because the foreign policy concerns that I discussed at the outset would be equally applicable regardless of the norm that is at issue. In each of these cases, you're talking about a claim that would require a federal court to find a primary violation of international law based on the conduct of a foreign sovereign on its own soil. And that's true regardless of which of the seven norms is at issue. So if you were looking for a straight-line way to write an opinion in this case, one way to do that would be simply to say at the second step, much as in Jesner, that these sorts of claims, these sorts of aiding and abetting claims, as a categorical matter are likely to raise these sorts of foreign policy concerns as well as the broader separation of powers concerns that underlie this court's reluctance to recognize implied causes of action. I'm sorry. I was just going to ask you if your argument is restricted just to aiding and abetting or would it extend to other forms of secondary liability like civil conspiracy as well? And if not, why not? If yes, why? It could potentially. And I don't want to prejudge an issue that could be coming to the court because there is a case recently decided by one of the courts of appeals that involves the question of conspiracy liability. I think many of the same arguments that we're making at Step 2 could apply in that context. But again, I don't want to prejudge that. I think that what we do have is a very robust body of experience now with these sorts of aiding and abetting claims. And I do think that it is clear, and the government sets this out at some length in its brief, that this category of claims is especially likely to raise these sorts of foreign policy concerns. And this court, in its most recent ATS cases, has looked to that body of case law, the broader body of case law, concerning implied causes of action. And there, under Egbert, the question is whether there is any sound reason to believe that Congress might not want to recognize this type of liability. And the fact that these concerns arise so frequently in these sorts of cases is sufficient to satisfy that standard. I'm a little bit lost when you answer, Justice Barrett, because you start by saying your first-line order is to say you can't recognize any claim outside of Blackstone's three. And you're basically saying any claim, including conspiracy, is always out under step two, correct? So you're asking us, basically, to overrule SOSA. So with regard to our first-order submission, which is that the court should shut the door that it left open in SOSA. That would be overruling. We don't think that that was a holding in SOSA. Assuming I don't agree with you because in Cabell and Jesner we called it a ruling. But putting aside that that's what we called it, you are basically saying if it's a holding, overrule it, correct? If it is a holding, we don't think that SARI decisive justifies retaining it. All right. And I'm happy to. Let's go to that, okay? There's about 300 of these cases that were passed that have ever been brought. That's not an enormous sum. After Cabell, that number dropped precipitously, all right? So it's not as if this is such a large number of cases that it's overwhelming the courts below. We don't see a rush in the four circuits that permit aiding and abetting liability of new cases. So I'm not sure why this has become unworkable in the SARI decisive sense. But we have the Convention Against Torture of which we're a member, and China's a member, and Russia, and a whole bunch of other countries. And that does require nations to ensure that people who are complicit in violations of international law are held responsible. So we'd be reading out of the ATS and probably the TVPA our obligation under the convention. And finally, what do we do with the thing you rely on, the Crimes Act, okay? You say the Crimes Act only made piracy aiding and abetting liable. It made piracy aiding and abetting liable. But it also said that violations of any safe conduct, which is not piracy, that had to do with ambassadors, that any actions that in any other manner infract the law of nations, I'm quoting it, and those who persecute or solicit any such process that violates an ambassador's immunities, and stated that those people would be deemed violators of the nations of law. That seems to me like an aiding and abetting provision. So it goes back to Justice Kagan's point that what aids and abets an international norm is specific to each one, and it may not be identical for all, but the law of nations does have forms of aiding and abetting. Okay, I think that there were three parts to that question. Let me address them in turn. First, with regard to the stare decisis effect of that portion of SOSA, assuming, arguendo, that it is a holding. I do think with respect, Justice Sotomayor, this is proven to be unworkable in the lower courts. And the profusion of lower court cases that have... Can I stop you there? What's unworkable about it? Let me just ask you something. In terms of aiding and abetting this crime, the allegation is that Cisco, knowing that China was going to torture Falun Gong adherents, actually promoted sales of its technology, not only by telling them that it could do it if they bought this technology, but custom making it as it bragged to the Senate so that it could identify 90% of such adherents. It is alleged that by its internal and public statements, it knew that those people would be tortured. So, what is the problem with how that fits into any conscious aiding and abetting statute, including our own domestic one, that requires active inducement and active participation? May I answer the questions that are on the table? First, with regard to the allegations...  Thank you. With regard to the allegations in this case, Justice Sotomayor, it will not surprise you to learn that Cisco vigorously disputes those allegations here. But I want to put this in the frame of where you started with your question, which is the experience of the lower courts. You are right that there have been around 300 of these cases. As we point out in our brief, there have only been six cases where plaintiffs have prevailed with a monetary recovery. And in the meantime, we have seen the lower courts struggling with this question of what norms to recognize, what the scope of those norms are. And our submission is that this aspect of SOSA in a post-eerie world, recognizing new causes of action, was wrong at the time, but recent developments have made clear that it is no longer tenable. Namely, this court's view in cases involving implied causes of action, that this is quintessentially a legislative endeavor. Second, with regard to the Convention Against Torture, the provision to which you refer is Article 4, which is a provision concerning criminal liability. And sure enough, when Congress, in the wake of the Convention Against Torture, enacted the federal criminal prohibition on torture, it incorporated 18 U.S.C. 2 and provided for aiding and abetting liability. There was no requirement in the corresponding provision of the Convention Against Torture for civil liability, Article 14, for aiding and abetting. And finally, with regard to the last part of your question, the Crimes Act of 1790. Yes, it's true, for violations of safe conduct, Congress did include soliciting, and as we point out in our reply brief, so did Blackstone. That is a form of secondary liability. It's not full-fledged aiding and abetting liability, and that just underscores that when Congress acts, it often acts in a reticulated fashion with regard to secondary liability. We could talk about the Genocide Convention Implementation Act, the War Crimes Act. There are many contexts in which Congress imposes broad criminal liability but narrower civil liability. It may very well be that the conduct in some of these cases is unlawful. It's simply not the subject of a civil cause of action under either the ATS or the TVPA. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? What do we do with the congressional statements at the passages of TVPA where it says that they want us to continue under the ATS addressing violations of international law? It was either the House or the Senate report that made that statement explicit. First of all, with regard to the TVPA specifically, and I want to make sure that I address any questions that the Court might have about that question presented, we obviously don't think that the legislative history supports respondents' broad view of the meaning of the term subjects, and that is because the Senate report, after a passing reference to aiding and abetting, talked about precisely the kind of command liability that I referred to at the outset. But second, I think that Congress was quite careful in enacting the TVPA really not to take a position, even in the legislative history, about the question that we've been discussing for most of the first 20 minutes of this argument, which is whether or not the ATS validly can be expanded to new primary norms and a fortiori to aiding and abetting. I'm not sure how you get to your position that subjects, too, can't mean aiding and abetting, because command liability doesn't necessarily require subjecting someone to the torture. It makes someone who's in a command position who knows of the torture and permits it to happen, but doesn't aid and abet it in the sense that we have defined aiding and abetting. We've defined aiding and abetting as an active step in permitting and encouraging the substantive act. So I'm not sure how you get to limit the word subject in the way you're suggesting, because command liability is a very different concept. Justice Sotomayor, it is a very different concept, because command liability is a form of vicarious liability. By contrast... Exactly. And so to the extent that Congress used the word, subjects has an aiding and abetting concept tied to it by definition. I don't think that it does, and notably, respondents don't point to a single other federal statute where subjects, too, is used to connote aiding and abetting. By contrast, we have nigh on 100 statutes in the appendix to our reply brief where Congress does use the term aids and abets. Well, I think the dictionary says to cause, to undergo, or submit to, to expose, or to make someone liable or vulnerable to something. I don't know any other word to define aiding and abetting but those, that you are participating in an act or causing or exposing someone to it or helping to submit someone to do it. I don't understand. Justice Sotomayor, there's actually not a great deal of disagreement about the dictionary definitions of the verb subjects. I think that the core notion is to cause someone to undergo or experience something or to expose someone to something. And in our view, those definitions require inflicting some action on the victim. So we don't actually accept the view that, say, merely facilitating something to happen- So that the person who's in the room with the torturer and hands him the instruments but doesn't actually inflict the injury is not causing the injury? That person could well be primarily liable in that context. Why? Under your theory of what causing means? I think that that person could be within the realm of people who participate in the primary act. And I think that if you were, say, indicting that person in a criminal case, I don't think you would necessarily be indicting that person under 18 U.S.C. 2. But if you disagree with everything that I've said- But if you disagree with everything I've said so far in this colloquy, Justice Sotomayor, I have one more card up my sleeve, which is the definition of torture, which requires the offender to have, quote, custody or physical control of the victim. Now, you might say in response to that, well, how can it be that someone who is up the chain of command would satisfy that since, after all, I'm standing here saying that this just covers command liability? I think that that would cover people who have direct or indirect custody or physical control. But again- But I'm sorry, that definition tells you what torture means. It doesn't tell you who's liable for it. What tells you who's liable for it is any person who subjects another to torture. But, Justice Sotomayor, as we explain in our reply brief, we think that that reference to offender has to mean the people who would otherwise be liable. So, sure, you're right. We're relying on the definition of torture. We think that definition is confirmatory of our position. And I think that this does, with respect, accord with common sense. Let's take this case. There are two individual defendants who are the subject of the TVPA claim. The former chief executive of Cisco and the vice president who is responsible for Cisco China. Nowhere in the 100-plus pages of complaint in the joint appendix do you find a statement that either of these individuals subjected Mr. Lee to the alleged misconduct. And I would respectfully submit that that is not how you would use ordinary English. Counsel, that might be a failure in the complaint, but that's not the issue before us. Assuming it did, because that's what we have to say. I do not think, with respect, that Respondent Lee plausibly could allege that here. But I think that that just confirms that when you're talking about someone who is alleged to have facilitated the act, these are people who stand at a much further level of remove than your hypothetical person who hands the weapon to the person who directly inflicts the act of torture or misconduct. Thank you. Justice Kagan, anything further? Justice Gorsuch? Justice Kavanaugh? Two things. You said six cases in which plaintiffs have prevailed. Does that include settlements or not include settlements? I believe that that is monetary recoveries in court. And do you have any statistics on settlements? I don't. And on the TVPA, I understood your argument to just be central bank, end of story. Is that a good summary? I think that that is a good summary. I think even if we didn't have central bank, I think our view is the better view of the language. But I think in the wake of central bank, if this court hasn't said that it's a magic words requirement, I think that the court came pretty close to that. And the court did say that even the phrase directly or indirectly is insufficient. I would say subject is not even close to that. Thank you. Justice Barrett? So one difficulty or question I should say that I have about your front line argument about freezing this with the Blackstone III is that in Sosa, the court said it had little evidence to think that the first Congress had in mind anything beyond the Blackstone III. But I'm not sure that's right. I mean, Professors Beaulieu and Clark have done research to suggest that, in fact, at the time that the ATS was enacted, the law of nations did recognize causes of action for the violence committed by an American citizen against a foreign national. Do you want to address that? I suppose that the court could. I'm aware of the Law Review article by those two distinguished professors. And I think that the court, if it so chose, could leave the door slightly open to parties coming forward to make the case that there were other norms that would have been recognized by the first Congress. That is not what is at issue here. And again, the way that this case has been litigated, respondents have argued for a categorical right for aiding and abetting liability. And I don't think that you can fit that into that particular box. Well, this kind of goes back to Justice Kagan's point. Those are all the causes of action. You're talking about the scope of liability, which is a slightly different point. I'm just saying that the frontline rule that you want of just freezing the line at those three, that's part of the concern that I have with respect to that one. But let me ask you a question about your argument about aiding and abetting liability and the expanse of that. Doesn't it seem a little odd if the ATS is primarily a jurisdictional statute, which I take your first line position to be, to say that there's a categorical rule about whether aiding and abetting liability can attach categorically or not to a jurisdictional statute? Just thinking about it in the categorical way Justice Kagan was pressing you on, it does seem a little bit odd to conceive of it that way. That is the discomfort that I think this court's decision in SOSA with respect created. Because, after all, we invoke central bank with regard to the ATS as well as the TVPA, and you might say, why is central bank relevant here? This is just a jurisdictional statute. I would hope that it would follow a fortiori that if the court doesn't infer aiding and abetting liability, even when you have an express cause of action, the court would not infer aiding and abetting liability when the cause of action itself is entirely a judicial creation. Unless there was evidence that at the time the ATS was enacted, there was aiding and abetting liability for a particular offense against the law of nations, correct? Yes, but we certainly don't have that here with regard to any of the seven norms at issue. And so if the court wanted, again, to just draw a line around the three core offenses, and whatever else might be in that original 1789 bucket, that's an easy enough footnote for the court to write. So perhaps you might be satisfied with a rule that said there's no categorical availability of aiding and abetting liability, but it doesn't exist with respect to the seven offenses with which Cisco was charged? Correct, that's right. And to the extent that Justice Kagan's question might have had the implicit premise that this could be worked out on remand, respondents have had every opportunity to make that argument, and I would invite the court to go back and look at the Ninth Circuit briefing. And you will search that in vain for the kind of norm-by-norm analysis that we're discussing. Thank you. Justice Jackson? Can I just pick up on that, because I just want to be sure I understand. So you would be okay with a rule that says there's no categorical preclusion of aiding and abetting liability? I think that the court should go further than that. Obviously, with our first-order argument, that would implicitly shut the door to anything other than the norms that I was just discussing with Justice Barrett. I think that the court should make clear, again, that there is no categorical cause of action for aiding and abetting liability. No, but that's the opposite of what I'm saying. That is what you're asking for, and I understood Justice Kagan to be positing that there might be. There might be in any circumstance in which the norm would be included under SOFR. No, I mean, I think our Step 2 argument would apply to any norm beyond potentially the three core offenses, because as I said to Justice Kagan- I'm sorry. I'm just trying to understand what aiding and abetting liability, your position is with respect to that. And I had understood, and maybe I was mistaken, that you were asking us to categorically preclude recognition of aiding and abetting liability as if it was a separate cause of action that was being brought to the table for inclusion under SOSA. And what I'm positing, and what other justices have pointed to, is that aiding and abetting liability could instead be construed as secondary to some underlying cause of action. And so to the extent that an underlying cause of action meets the SOSA test, then you might have aiding and abetting liability, depending upon the historical circumstances of aiding and abetting with relationship to that norm. But it's not as though, I think, you are looking at aiding and abetting liability as if it is a completely separate cause of action that we're just applying SOSA to as though there was no underlying cause of action. Justice Jackson, I think I understand the question, so let me give you my best effort in an answer. First, I think that to the extent that we say that a norm-by-norm analysis is required, that would be at step one of the SOSA analysis. But I do think that at step two, regardless of whether you conceive of this as a separate cause of action or a question concerning the scope of a cause of action, the analysis at step two is the same with regard to any of these norms. So I don't think it would be... But why is that? That's the second part of my question. All right, so let's say we have an underlying piracy claim, which we are, just for the purpose of this question, are saying is included in ATS. I had understood your argument to be that regardless, no aiding and abetting. But with respect to step two, to the extent that you're talking about the foreign policy concerns, couldn't there be a circumstance in which the foreign policy concern would not care whether or not there's aiding and abetting liability? In other words, what's creating the foreign policy concern is the underlying claim. And to the extent that, say, China says, we don't care about the underlying claim being brought here, what additional work from a foreign policy concern standpoint is attaching or having an aiding and abetting liability claim? So three quick points in response to that, and then I'll sit down. First, I think that this is, in terms of the paradigm, very similar to Jesner. You could have made the same argument in Jesner that, well, it's not really a question concerning a cause of action. It's a question concerning the available defendants, namely whether foreign corporations could be defendants, and the court nevertheless conducted the step two analysis. Second, with regard to how the step two analysis works, I want to bracket for the minute the three core offenses. I think with regard to any of these other offenses, you have the same fundamental problem that raises foreign policy concerns and the broader separation of powers concerns, which is no matter what the norm is, you're talking about a primary violation of international law, in this case by a foreign sovereign against its own citizens, and that is by far the main run of these cases. But that's in this case. What if we have a primary violation of international law that doesn't involve the underlying country, and for APS purposes, wouldn't the point of that statute be that the United States is making its courts available for the adjudication of that claim in a way that actually supports foreign policy? The other country would want its nationals to have a forum. My friend, Mr. Hoffman, I suspect, may get up here and say, well, you can posit such a case. And I think our response to that is no. This court made clear in Jesner that this is a categorical analysis and where you have a category of cases where it is likely that you're going to have these concerns. You therefore have a sound reason to believe that Congress might not want to extend liability to that category. That is precisely how this court decided Jesner, and it would make this court's APS cases congruent with its cases concerning implied causes of action more generally. And I said I would have one last point, which is that the government has a footnote in its brief where it makes the point that with regard to these three core offenses, what is different about those offenses is that they involve either conduct that took place in the United States, such as the famous Marbois incident, or conduct that takes place in the high seas. And we would acknowledge that the foreign policy concerns might not be as great in that context, even if the separation of powers concerns are equal, and that's a reason why the court might want to leave open the possibility of aiding and abetting liability as to those offenses. Thank you. Thank you, counsel. Thank you. Mr. Gannon. Mr. Chief Justice, and may it please the Court. Respondents allege that petitioners aided and abetted international law violations committed abroad by foreign officials. Such allegations should not be cognizable under either the Alien Tort Statute or the Torture Victim Protection Act until Congress actually says that they are. With regard to the ATS, that follows from two separate modes of analysis. First, under the second step of SOSA's own test, separation of powers concerns should readily prevent the court from creating a private right of action for aiding and abetting. Second, the court might wish to conclude more generally that it should not recognize any new norms under the ATS, notwithstanding SOSA's decision to leave the door ajar to that. With regard to the TVPA, the statutory text and context do not impose aiding and abetting liability, especially in light of the background assumption reflected in Central Bank of Denver that in the civil context, Congress should do that expressly. I welcome the Court's questions. So if we adopt that approach, what would be left of SOSA? The original three would still be there under SOSA. The statute would not be a dead letter. As my friend pointed out, the TVPA has recognized causes of action for torture and extrajudicial killings. But otherwise, I think you would be going through the SOSA two steps. So I'm not sure which question you're talking about, the first mode of analysis or the second mode of analysis. But if you were going to rule out recognizing any additional norms, I think you would just be sort of grandfathering the original three and potentially other things that the first Congress would have recognized. You would be saying that the door isn't open to recognizing what we would decide today under modern international law or analogous in some way. The second mode of analysis that we're talking about under SOSA step two is the one that the court employed in both Kiobel and in Jesner. And so my friend was just talking about all the ways in which Jesner required a step two analysis to be done in a categorical level. This responded to questions from several of you. The same thing was true of Kiobel. In both of those cases, the court essentially skipped over the question of whether there was a norm that was established and said that going to step two concerns in Kiobel, it was the idea that principles underlying the presumption against extraterritorial application of statutes would be applicable. We think the same thing should also be true here of the central bank principle. And in Jesner, the court said that it was looking at a categorical matter at a scope of liability question, even though it wasn't about the norm. It was saying that the question of is this category of defendant going to be held liable said we're going to consider that on a categorical basis. And the fact that it's going to present foreign policy concerns in many cases, not necessarily all cases, but in many cases was sufficient to say you're going to categorically rule out foreign corporations as defendants. And we think that the same thing should be true for aiding and abetting claims, because the mind run of those claims thus far has involved cases like this, has been allegations that somebody has aided and abetted a primary violation that was happening in a foreign country, often by state actors, because many of the norms, many, but not all of the norms need to be done by state actors. And therefore, the entire case is parasitic on having to prove that foreign government officials engaged in serious human rights violations in their own countries. And that is necessarily going to raise foreign policy concerns in many cases. Mr. Gannon, if we sort of took away that aspect of this case, which I understand you have fundamental disagreements with, but just focus more on what's presented to us here, which is this aiding and abetting question, and I guess one way to think about this, about how we should think about aiding and abetting, is if you take the three original Blackstone, why it is, suppose that this were a case only about that, and then the question is, does that also include aiding and abetting offenses? What would you say? How should we analyze that question? As my friend just pointed out, I do think that the foreign policy concerns are reduced in the context of those three norms, because of what we point out in our brief, and I think that the court understood this in Kiobel, that those cases, the primary violation, is generally going to be occurring in the United States or on the high seas, not in the territory of a foreign country. So I do think that if you're going to look at this from the other side and sort of try to say, are there pieces of aiding and abetting liability that would pose fewer threats, I think the ones where the primary violation is not in a foreign country is a good place to start. I wouldn't just limit it to cases that involve foreign government officials. I take it what you're saying is because those foreign policy concerns are less, our analysis would be different. You might come out with a rule that said, okay, as to piracy, aiding and abetting goes along with it. Is that correct? I would say two other things. We still have two other main reasons why we think that under Step 2 that the court should be cautious about recognizing aiding and abetting liability. I mean, one question is whether Step 2 SOSA applies, if the question is the original Blackstone 3. Oh, I think very much so. And then the question whether there's secondary liability that comes along with it. You could say, well, SOSA doesn't apply sort of for two reasons. First, it's not a separate cause of action. SOSA was designed with the question of new causes of action in mind. Aiding and abetting is not a cause of action, and it's also not new. I mean, if the idea is back then when there was an accepted norm of piracy, was there also an accepted norm of aiding and abetting piracy? It doesn't sound like a question that one would naturally apply SOSA to. Well, I don't think that's true in light of the way the court approached this analysis in Kiobel and Jesner, because I think that foreign corporations are not liable for piracy, and I think that an attack on an ambassador that happens in a foreign country is not going to touch and concern the United States in the sense that was probably going to survive Kiobel. And so in both of those instances, I think that SOSA itself is recognizing that just acknowledging the norm isn't enough to say that you're going to get home. And I think that SOSA didn't decide a lot. They left open that there's going to need to be a lot more analysis if we're ever actually going to get to yes. SOSA got off the train at the first stop, but it recognized that there were going to be additional stops, and we think that that's why for aiding and abetting, as this significant recognized category of secondary liability, Central Bank tells us that we expect Congress should speak to that expressly before it does that, and we do think of that as a significant expansion of liability. And then the third reason that we have is the analogy of the TVPA. There hasn't been much talk about it, as much talk about that this morning, but that's the second question presented. If you agree with our position that aiding and abetting liability is not included within subjects under the TVPA, then we think it is relevant that the one-time Congress has tried to codify a cause of action... Yeah, I got that argument for the briefs, but if... So one question that we just talked about was whether SOSA applies at all to this question of whether aiding and abetting comes along with it. You say yes, even if you're right. What I took from the first part of your answer was that you think that there is a... I mean, tell me if I've gotten this wrong, but a separate analysis as to each particular norm that has been recognized. In other words, you would go through the question with respect to piracy, or you would go through the question with respect to ambassadorial rights, or something like that. I think you could do it that way. I think that the fact that the Court didn't do that for foreign corporations and extraterritoriality would be a reason to say that because in the vast majority of any potential norms and the cases that are being brought, frankly, aren't piracy and assaults on ambassador cases, that ruling out that particular potentially theoretical category isn't going to make a big difference, and the Court was comfortable making categorical decisions in Kiobel and Jesner, and we think that that's appropriate here, especially in light of how unwilling the lower courts have been to receive what we took to be a general note of caution in SOSA, and that's not the way the lower courts have been applying the two-step analysis, we think. Can you talk about that for a moment? What is the need for us to intervene to address? Are there problems? What is the scope of the problems of people not respecting the admonition in SOSA that this is a door to be closely guarded? Yeah, I do think that there was supposed to be vigilant doorkeeping, and I would say that our view is that the lower courts have been too permissive about acknowledging additional norms and what we would consider to be expansions of norms, especially including aiding and abetting. We've been trying to get the Court to decide the aiding and abetting question since the mid-2000s. That's been a significant category of cases, and I take my friend's point that it's going... my friend on the other side's point that it's going to be a reduced category after Kiobel and Jesner, but it's not gone. As this case itself demonstrates, the Ninth Circuit held that this is not... it doesn't require enough extraterritorial conduct to run afoul of Kiobel, and this is a U.S. corporation, and therefore, here we are. We're still litigating about an allegation where the primary violation that needs to be proved is the thing that generally is going to present foreign policy concerns because it is an allegation that a serious human rights abuse happened in a foreign country. In this case, and many cases, by the way the foreign government treated most U.S. citizens. Well, and what lesson should we take from cases like Egbert and the Bivens context and our decisions on Teague about these doors that have been left open? We have... we agree with petitioners that that is an available argument here to say that you should close the door, that the door, having been left open, has created too much mischief, and that, frankly, it is going to be illusory to think that there is any likelihood that this court is going to recognize a new norm in which there's going to be liability that isn't very closely tied to one of the original three torts or something else that the first Congress would have recognized. And so we have drawn the analogy from Edwards, and I would say that because this involves common law methodology, by definition, Sosa was saying the court has been invited by Congress to appeal to the common law in order to recognize individual norms beyond the original three, because that... it requires the court to exercise common lawmaking powers. We don't think it requires full-bore statutory stare decisis types of considerations, and there isn't that much reliance, I don't think, when this court has repeatedly said no to each new question that has been brought to it under the ATS. Thank you, counsel. It seems to me that you have a serious conceptual challenge because we've held that the first Congress wanted courts to, you know, look and find the rights of action that are available under common law in Sosa, and now because the court has departed from that general approach to statutory interpretation, it is like, you know, a dinosaur that is still on the horizon, and I wonder, you're certainly not being, I would say, certainly not being faithful to the first Congress's intent, at least as it was interpreted in Sosa, and it seems to me that maybe you can just talk a little bit about how we're supposed to reconcile that challenge. Well, I do think that's a bit of a puzzle because of the sort of eerie revolution, and this is the thing that Sosa talked about. Both the majority opinion and Justice Scalia's concurrence wrestled with how to deal with that, and I think that they both agreed on the idea that at least those things that the first Congress would have expected to be recognized would be fine, and therefore that's why we're grandfathering in what would have been called the Blackstone Three Torts, but because the court now understands better than the first Congress did, and I understand the discomfort with that, that recognizing a cause of action is a legislative endeavor that it's going to do only cautiously. The court has repeatedly said in these ATS cases and in the Bivens cases that it's not going to extend any further if there's any reason, counseling, hesitation, and so I think that we're reconciling the court's modern understanding of its appropriate role in the separation of powers with the fact that the first Congress only wrote a jurisdictional authorization with this expectation that there was a possibility of causes of action being recognized, but now we know Congress could do that, and Congress knows that it's supposed to do that, and that's why Congress enacted the TVPA, because it was codifying Philartica. The TVPA actually isn't about torture that happens in the United States, and it isn't about aiders and abettors, it's about the actual perpetrator acting under a color of foreign law, and so Congress did codify that result after it was questioned whether the ATS even allowed Philartica. In terms of your request, though, that we overrule, usually when we overrule a past decision, it's because we think it was wrong, and yet you're not really saying that either when you say, well, we should preserve these three. I'm not quite sure whether overruling is an appropriate response when we don't think we're not saying that the Sosa decision was wrong when it interpreted the intent of the first Congress. No, the only question is about the aspect of the Sosa decision that leaves open the possibility, leaves the door ajar to recognizing additional causes of action that Congress wasn't aware of, that the first Congress didn't expect and wasn't aware of. So I understand that in the abstract, Congress might have expected that the law of nations would evolve. That's one way to talk about it. I'm not sure that's what they would have expected. I think in the pre-eerie sense, there was an understanding that it was out there. It was the brooding omnipresence. Maybe you discovered new bits of it, but this is all they thought that existed. I do think that the court can draw the line there, and it's not overruling Sosa. It's not changing the holding of Sosa. It's changing this aspect of whether we're possibly leaving this open, but Sosa still, at step two, expected that there would be all sorts of other reasons to be cautious. It expected that we'd be careful about the norms. It expected that there could be other defenses that could be relevant. It expected that there could be case-specific foreign policy concerns that we don't think that that's necessary in every case. Thank you, Counsel. Justice Thomas, Justice Alito, Justice Sotomayor. ATS is a cause of action, correct? ATS is a jurisdictional statute. Jurisdictional statute, all right. It's a cause of action. They can bring a lawsuit on the Black Zone 3, according to you. Because Sosa has recognized that it was willing to infer that cause of action that Congress had not expected to provide it for. Infer or not, Mr. Gannon, if you don't want us to overrule, you want us to overrule Sosa, do you want us to overrule it to say that even the Black Zone 3, there's no cause of action for them? No, we are not asking you to overrule Sosa. So it's either a cause of action or it isn't. Which is it? The ATS itself is not a cause of action. Sosa recognized that it was just a jurisdictional statute. It recognized that it had the ability at the time when it was enacted that the courts were able to infer causes of action. And that those three would have been inferable at the time and therefore at least those would be recognized. Bevins and Egerts don't help us because whether it's expressed or implied causes of action, they've been created for the Black Zone 3, correct? And you're saying don't add a fourth. Don't add torture. We're saying not to extend it any further and that's why we think it's relevant. So what you're basically saying if there wasn't the torture, the TVPA, there wouldn't be an actionable cause of action at all for torture or extrajudicial killing. Even though when Congress addresses that, it doesn't just create a cause of action under the ATS. It expands liability to include the potential for U.S. citizens, not just for aliens to sue, correct? Yes, it expands the category of plaintiffs. So what you're basically saying is the first Congress, if it had known that there would be an international and current U.S. view that torture and extrajudicial killings violate international norms, that that first Congress would not have wanted us to recognize that as a cause of action. For aliens, for aliens. I'm not saying that that's what the first Congress would have expected. I'm trying to be faithful to Sosa's own analysis which recognized that it would take account of developments that have happened since the first Congress and it said at that time that it did not see sufficient developments that would preclude it from leaving the door ajar with sufficient caution. We think that there have been subsequent developments in this court's case law. So if we disagree with you, that under step one of Sosa, torture and extrajudicial killings are recognizable under step one. And we go to step two. Step two requires us to look at whether recognizing that cause of action for torture and extrajudicial killing have foreign policy implications. By the very nature of torture and extrajudicial killings, a foreign state is involved. Correct? Because torture is defined by official state action, isn't it? As it is defined in the TVPA, yes. I would not expect my friends to agree to that under the ATS. They can answer that. I was assuming that, okay. Yes, with respect to the way it's been defined in the TVPA. We think that Congress has spoken to lots of specific questions in the TVPA that allow actions like Philardia to proceed. Can you let me finish with my question? They'll tell us. I am making the assumption that torture requires official state action. Then by its nature, whether it's aiding and abetting liability or primary liability, the same kind of embarrassment is going to exist, correct? Meaning, if we can sue someone, if we can sue a Chinese agent who happens to come to the United States for torture in China, China is going to be as embarrassed as if we sue Cisco for that same torture, correct? I think that I take the point, but I think that Congress in the TVPA drew a line between the perpetrator and the interviewee. Yes, we could go back to whether subjects or not. But assuming that, as I do, that subjects means some form of secondary liability, if not primary liability, then tell me, what is the foreign policy implications for this pursuit? When President Trump in 2020, when he was talking about the Chinese policy, was encouraging China to respect and not persecute Falun Gong adherents, and where he states that he stands by the principle that American technology should not be used to further that persecution. What do we do with that? How do we find that there's potential embarrassment from that? How do we find that there's a potential foreign embarrassment from complicity in torture, which the Convention Against Torture would not permit? The Convention Against Torture would permit the criminal prosecution, and so would our laws, for complicity. So there's less embarrassment from that than from civil liability? I'm saying that Congress has already drawn the line with respect to both halves of this. They have implemented the TVPA by enacting a criminal statute that applies everywhere in the world and includes complicity. I agree with that. But that's a cause of action that is brought by federal prosecutors. What you're suggesting is that there is less embarrassment for the government from having an individual pay damages. There's more embarrassment for an individual paying money than from a criminal prosecution where that person is put in jail for the same act of torture. I'm saying that we at least have control over when the federal criminal prosecution is going to be brought. And I say that we have, of course we object to human rights violations that are occurring in China and in other countries, but we have other foreign policy tools that don't require individual lawsuits filed by lawyers that don't have to necessarily comply with all of the concerns that we have about our relationship with any particular foreign country at the time. And so I appreciate the fact that SOSA holds out the possibility of a case-specific objection. If we said this is flagrantly incompatible with our foreign policy right now, I would hope that the courts would listen to an objection like that. But as I was saying to the Chief of Justice before, because we think that as a categorical matter, the notion of civil aiding and abetting liability goes beyond what the convention requires and goes beyond what we think Congress has codified in the TVPA, that we think that Congress should be the one making that decision. And it's not just the foreign policy concerns, it's also the central bank idea, that we know that Congress is aware that there's no presumption of aiding and abetting liability in civil cases unlike criminal cases. Justice Kagan? Justice Gorsuch? I'm not sure I understand why we would need to overrule anything about SOSA. We said there that we had no basis to suspect Congress has any examples in mind beyond those three Blackstone torts, and we said that future developments might preclude federal courts from recognizing new causes of action. I think that the developments, for the reference to developments, there hadn't been intervening developments, and I agree with you, Justice Gorsuch, that we think that... In the 20 years plus since SOSA, there have been some developments. There have been, and we agree with that line of analysis. And so, under that way of thinking about it, I think you would be saying that the door is no longer ajar because you were taking account of the things that the SOSA court said could be taken account of. And we think that you could do that with respect to individual norms at step two, you'd be applying a SOSA analysis if you adopt the broader argument and said that we think intervening developments in this court's understanding of how recognition of private rights of action is a legislative endeavor that is not going to engage in, is not going to extend any farther what has already been recognized, that would be consistent with what the court has been saying in both the ATS and the Bivens cases in the last 20 years. And each one of these that comes to us, we've rejected attempts to expand beyond those three. Well, I mean, you rejected some aspect that was being disputed in that case here. That's effectively the second argument here. If you go for aiding and abetting, you'd be doing the same thing with respect to that category that you did in Kiobel with respect to extraterritorial applications and in Jesner with respect to foreign corporations. You'd be sort of cutting out another sort of paradigmatic case that has arisen and is still arising after this Court's previous cases. Thank you. Justice Kavanaugh? In footnote 21 of SOSA, the Court said there's a strong argument that federal courts should give serious weight to the executive branch's view of the case's impact on foreign policy. When I was on the Court of Appeals, I took that seriously in terms of executive branch statements. From your perspective, are lower courts sufficiently paying attention to executive branch statements as dictated by footnote 21? Well, I think that in the early to mid-2000s, we filed statements in individual cases, and in some of this Court's cases, we've made statements and briefs that this particular case presents foreign policy concerns. We said that in Jesner. We said that the Jordanian government was concerned about it. They filed their own amicus brief. This Court took those concerns seriously, but it also went beyond that to say that it was concerned about the threat posed by the general category. And with respect to the lower courts, I would say that I'm not aware of recent cases where we've filed what I would call a case-specific concern that has been disregarded by the lower courts. In this case, we didn't file individual statements. There was another fall-and-gone case that was initiated in the early 2000s, where I think even before SOSA, the State Department filed a letter expressing its concerns about the potential interference. But as I've been saying, we think that at Step 2 of SOSA, you don't need to approach that with only case-specific concerns in mind. And I wouldn't think lower courts did either, would need to either, and that's why they could have, the Ninth Circuit here, I think, should have recognized that we've been concerned about aiding and abetting it as a category, whether or not we've objected to foreign policy concerns presented by the allegations in this case. But, of course, this case still does require plaintiffs to prove, and they admit that they're going to be proving, that the primary violations happened in China, at the hands of the Chinese government. I got that part. And that also distinguishes, the executive branch statement of interest in civil cases also explains why when you bring a criminal prosecution, the executive branch is controlling that decision. Yes, the federal criminal prosecution that applies extraterritorially, which is what Congress enacted in order to implement Article 4 of the Convention Against Torture. Can you just spell out, generically, what are the foreign policy concerns in some of these cases? In a little more detail, instead of kind of the bumper sticker. Well, they can be different, but they almost always are alleging very serious human rights violations that happened in a foreign country, either because the foreign country was participating in it, its officials were participating in it, they were supposedly looking the other way, they are not providing adequate redress for people that are there, and therefore they have to come to U.S. courts in order to vindicate them. In the South Africa cases, we express concern. But how does that harm the United States, because the U.S. has not been able to allow proof of this human rights violation by foreign officials or foreign governments? Because I think that's what you're saying. I am saying that by definition, foreign countries are often concerned about the fact that these lawsuits are being litigated here, and I was mentioning the South Africa cases in the 2000s, and in America where we filed an amicus brief about aiding and abetting liability, the South African government expressed concerns that having these cases litigated in the United States about apartheid and grievous things that happen under apartheid was inconsistent with the Truth and Reconciliation Commission. They had their own process that they wanted to operate and they thought that having plaintiff's lawyers making their cases involving 50 large corporations about all sorts of things that had happened over decades to lots of people in South Africa, that U.S. courts weren't the appropriate forum to be hashing that out. And in the Arab Bank case, Jesner, Jordan was concerned about the threat posed to a mainstay of its economy. There are all sorts of ways in which these lawsuits can threaten the relationship that we have, the bilateral relationship we have with these countries, and I understand my friends on the other side to say there's an amicus brief that says that you should internalize all of these costs. The corporation should have to pay for this, but frankly, that's a policy judgment that should be made by Congress. And the extent that the executive branch can bring criminal prosecutions when it wants to, when it thinks that that's appropriate, can file individual case-specific objections if it needs to, and Congress can provide for specific causes of action as it did with the TVPA where it has already said, you know, we're going to take the costs associated with allowing Philartica to be litigated where, you know, a Paraguayan governmental official who is alleged to have tortured somebody to death is going to be held liable in the U.S. court for those actions. Congress said that it wanted that action against the perpetrator to be available, but we've continually said that we think that it shouldn't be expanded to aiders and abettors. On that last point about Congress, this is my last question, and this is picking up on the Chief Justices and Justice Gorsuch's question. By leaving the door somewhat ajar but never quite getting there, we've maybe misled Congress into thinking, oh, we don't need to do anything about these human rights things. The courts are taking care of it. And I'm concerned at a separation of powers level that we're not really allowing suits to go forward, but Congress thinks we are because of a lack of clarity in our case law. And that's just an observation I have after 20 years of dealing with these cases, and I just want to get your reaction to it. Well, I mean, I'm hesitant to try to figure out exactly when Congress is incentivized to act and when it isn't incentivized to act in terms of the dialogue between the branches, but we do think that this is a legislative decision that they should make, and that in the Anti-Terrorism Act, the Congress responded and said that we're going to acknowledge aiding and abetting liability for acts of terrorism by foreign terrorist organizations. And so that's something where Congress is aware. I take the point that to the extent that the door is open, Congress doesn't have a clear incentive to go through and start saying, this is the one that we think ought to be codified, as it did with the TVPA after Filartiga and Tell Oren. And people put their resources into a court suit rather than lobbying Congress, arguably, but I'll leave it there. Thanks. Justice Barry, if I could just pause for a moment. I've been notified that there will be a flyover of four planes at 1122, and I just want to announce that so people aren't alarmed or told the noise might be big. I don't know why they didn't check with me. Justice Barry. Well, Mr. Gannon, I'll try to get my question out quickly. More dialogue between the branches. Mr. Shamegain said that there are several cases pending in the lower courts or maybe one about civil conspiracy and that sort of secondary liability. Has the United States taken a position in those cases? No. I think my friend was talking about a Fourth Circuit decision. We were actually a third party defendant in that case, and we didn't address those issues in that case, and we haven't taken a position about conspiracy there. Do you have one here? No. I think that the aiding and abetting analysis, we think, under Central Bank of Denver, makes this an easier case, and the foreign policy concerns that require the primary violations to be happening abroad in the vast majority of these cases I think make it easy to say that they still present foreign policy concerns in a way that it's possible that the conspiracy analysis would be different. I'm not sure. We just haven't engaged in that analysis yet. Thank you. Justice Jackson? So I guess I'm still struggling with why the concerns that you've raised aren't best addressed on a case-by-case basis. I understand that you'd like to do this categorically, but it seems to me that you've mentioned other circumstances, other cases where these claims have been raised, and the foreign nation has filed a brief, and the government has filed a statement that actually talks about the foreign policy concerns with respect to that particular case. So why isn't that the better way to address SOSA Step 2 and the concerns the United States is talking about? Well, I mean, I would say that Kiobel and Jesner basically rejected an even In a different context. a middle version of that. I understand, but they were looking at a different issue. And here's the real basis of my concern is the language of the ATS itself and the extent to which Congress has now said that district courts shall have original jurisdiction of any civil action by an alien for a tort only committed in violation of the law of nations or a treaty of the United States. You keep suggesting that this is about the court expanding ATS or the court implying a private right of action. This is pretty clear language that Congress does want civil actions by aliens for torts only committed in violation of the law of nations to be permitted. So I'm worried that your categorical take off the table is actually narrowing this statute in a way that is inconsistent with Congress's intent because aiding and abetting liability Do you dispute that aiding and abetting liability was widely recognized as part of the law of nations at around the time of the founding? This is not a new thing that we're coming up with that aiding and abetting liability was a part of the law of nations, right? Or is? I wouldn't quite agree with that. And I think that as my friend pointed out even when Congress went to codify aiding and abetting liability at the criminal level for the original three torts, it only did so with respect to piracy. I'm going back to the original language of the statute. What did Congress mean to authorize here? And you're asking us as a categorical matter to take aiding and abetting out. I could see that if this was not a part of the law of nations would be that we were just adding it. I could see that if the Congress hadn't said torts only under the law of nations. I mean the statute is looking at a particular kind of claim and authorizing it. And now you say as a categorical matter the court should be taking that off the table. I could appreciate in particular cases where having this particular person bring this particular claim against a corporation is going to raise significant foreign policy issues. But the U.S. hasn't filed such a statement in this case, correct? It's correct that we haven't filed a statement in this case. And is it the position of the U.S. that this particular claim is going to create a foreign policy problem? We haven't taken that position because we don't think that we need to. No, that's just because you're interpreting the statute that way. If I said to you you need to, my question is in this case do we have the kind of foreign policy issue that you say justifies taking this off the table categorically? Potentially yes. This is going to require these torts to be proved. The primary violations about what Chinese officials did in China needs to be proved in the U.S. court and that's necessarily going to create sensitivity in our relationship with China. But what I'm saying is we could imagine a world in which China says we don't care what you all do and in which the United States has not made a statement about its actual impact in this case and that is weighed against a statute that appears to be allowing these folks to bring this kind of claim. And so I'm just nervous about the categorical nature of this because I think the United States can protect its interests if it does make a statement that this particular claim is a problem. But to say never can a corporation be sued for aiding and abetting even serious human rights violations, first of all the aiding and abetting is not doing the work there in terms of the foreign policy problem. What's doing the work as you've said repeatedly is the underlying claim against the foreign government and so you could imagine a world in which some foreign government says I don't care if Cisco is being sued about this even if Cisco presents a bunch of, or excuse me, the plaintiffs present a bunch of information about the underlying torture. What difference does it make? They can't do anything to me. I don't care if that's going on. So why would Cisco be absolved and the plaintiffs here not get a remedy on the basis of some speculation about a foreign policy concern that the United States is not even willing to say in writing right now would actually occur. Sometimes having to take a position about an individual case has its own foreign policy consequences and I wouldn't say that we need both governments to actually come and have negotiations in front of a district court with declarations about what is the threat posed by this particular case but stepping back we made a version of this argument in Jesner about corporate liability and we said that corporate liability was something that was recognized at the founding and therefore you shouldn't rule it out categorically and this court rejected that argument and so I think that that is consistent with the caution in SOSA. It is consistent with a categorical way that the court approached questions like extraterritorial application and corporate liability in Kiobel and Jesner to say that we're not treating these at a granular case by case level and we also have in addition to the foreign policy concerns we have the Central Bank of Denver presumption that Congress from the beginning has distinguished between aiding and abetting for criminal liability purposes and civil liability purposes and that's a general rule that we think applies. Thank you counsel. Mr. Hoffman. Mr. Chief Justice and may it please the court. This case is about the systematic persecution of a religious minority by Chinese authorities and Cisco's partnership in that persecution. Each of the plaintiffs were tortured or killed by Chinese authorities because of their religious beliefs. Cisco provided substantial assistance to this persecution from U.S. territory by providing a customized surveillance system designed to identify Falun Gong believers to Chinese authorities for detention and forced conversion through torture and other barbaric treatment. Under petitioner's theory Cisco cannot be held responsible for aiding and abetting these violations no matter how substantial and direct their contributions were. Under Cisco's theory even the corporate actors who provided the poison gas for Nazi crematoria would not be liable under either the ATS or the TVPA. There's no basis in international law or these statutes under either the ATS or the TVPA for such an absurd result. The first Congress passed the ATS to fulfill this nation's obligation to enforce the law of nations. That is now aiding and abetting law of nations violations is itself a law of nations violation, meeting the SOSA test. There are no categorical reasons for excluding aiding and abetting liability from the ATS. If any particular case raises foreign relations or other issues the federal courts have many tools to address those issues on a case-by-case basis. Nor is there any basis to deny aiding and abetting liability under the TVPA. Congress intended the TVPA to supplement the ATS for torture and extrajudicial killing claims. Cisco subjected fallen-gone believers to torture and extrajudicial killing by identifying them and delivering them to their torturers. Such conduct has violated international law at least since Nuremberg. This court should not give the green light to U.S. corporations acting from the United States to help foreign governments commit torture or extrajudicial killing. I welcome the court's questions. Mr. Hoffman, how available was or common was aiding and abetting liability in tort cases in 1789? Well, according to the historian's amicus brief, and if Justice Thomas, you recall, in Sosa, this court relied very heavily on the same historians in their analysis. The historians say that civil aiding and abetting liability was very much available in the common law, but more importantly for this case, that aiding and abetting liability or accessorial liability was available for law of nations violations, including the three that this court identified in Sosa. But there were other law of nations violations. Even in Blackstone, there were other law of nations violations at the time. If you look at the Bradford opinion, for example, they were talking about violations of neutrality, aiding and abetting pillage. It was not, at the time, law of nations violations were not limited to those three, nor is the language of the statute. The statute says that aliens can bring a case for tort only committed in violation of the law of nations. It doesn't say in violation of safe conducts or piracy or the norms that exist in 1789. It says to enforce the law of nations by means of a tort action. And I think the significance of what this court did in Sosa, which really did reject a lot of the arguments that are being made, I think, by the other side, was to say that based on the history, just the suitor's opinion for six members of this court said that the door was not closed, that the federal courts had not lost their ability to handle tort actions for violations of the law of nations. And Congress has never done anything since 1789 to take away that mission. I mean, if we just limit ourselves now to 1789, the Blackstone III, plus any more that might have existed then, is it so clear to you that aiding and abetting functioned the same way and was recognized to the same extent with respect to all of those causes of action? I thought Judge Bumate made a pretty good case that, in fact, this kind of thing was norm by norm, that the evidence for aiding and abetting liability was much stronger with respect to piracy than it was with respect to ambassadorial violations, and then maybe even a step down with respect to the safe conduct violations. So why shouldn't we think of this as whatever the norms are, whether it's the Blackstone III, whether it's other norms that would have been recognized in 1789, or, as you think, whether we can go beyond the 1789 norms, whatever the case, that aiding and abetting liability should be thought of norm by norm rather than all in a sweep? Well, I don't think we have an objection to that. I think the issue for us, I mean, first of all, we've been criticized for asking for a categorical rule. The lower courts... Everybody's doing categorical rules on both sides here, so you're no less than... My only point is that the lower courts have all accepted aiding and abetting liability. We've been litigating aiding and abetting cases for the last 30 years. No court has said so far at the circuit court level that there isn't aiding and abetting liability, and they've done that based on their analysis of customary international law. With respect to the particular norms, we're happy under the ATS to accept what the scope of the law of nations violation is, because that was the point of it. The point of it for the founders was if there was a violation of the law of nations, this court was opening its courts, its new federal courts, to handle those cases in tort. And that satisfied our obligation under international law as a new member of the international community to say that to the international community. We will do that. And it also helped to handle situations where the United States would have been responsible if we had not acted. Marbrois is a perfect example of that. The Marbrois incident where the Continental Congress had no means at that point and was left to the courts of Pennsylvania to litigate that case, Marbrois was on their minds. And as Justice Sotomayor said... Yes. Sosa recognized that and said undoubtedly the ATS was there to create a jurisdiction in federal courts to hear cases. Whether it created a cause of action was more ambiguous. Well, I think... That's all right. Let me just spit it all out and then you can have at it. But Sosa was willing to spot that there might be at least three causes of action but recognized really the job for creating causes of action because of foreign policy concerns, as sympathetic as this particular case certainly is. But the responsibility for creating causes of action generally lies not with judges but with Congress. And it said, well, we know there are these three that they had in mind, but we just don't know about anything else and we should be really skeptical. And then in Jesner we said, in light of the foreign policy and separation of powers concerns inherent in ATS litigation, there is an argument that a proper application of Sosa would preclude courts from ever recognizing any new causes of action under the ATS. And I guess I just want to throw back to you Justice Kavanaugh's questions, which are, if all that's true and that's our law, are we kind of creating a mousetrap for plaintiffs in cases like this? Where you come and you bring something that expands beyond the three in some way, shape, or form every time you lose. And are we masquerading as to who are the real responsibility and where your efforts belong? Do they belong in the courts or maybe across the street? Well, we've done both. Justice Kavanaugh asked about whether there are only six. I've been involved personally in more cases than six, where we've gotten judgments. I would also point out that the Alien Tort Statute was used in the German slave labor cases, the Swiss bank cases, in which over $7 billion I don't doubt there are legitimate applications. The question is whether to expand it. I'm not sure that's responsive to the question. I guess what I'm saying is that since Sosa, before and since Sosa, the courts have recognized certain limited numbers of human rights norms. And Sosa itself recognized that what the modern law of nations was was international human rights law. But this court's never actually gone beyond the three. But you've never considered beyond the three. Well, we've had Chesner, we've had Kiobel, we've had Nestle. I mean, that's just the last decade or so. Can I respond on those, I think? The Kiobel, Chesner, Nestle series of cases was not about either Sosa, it was about Sosa Step 2 and Chesner. It was never about Sosa Step 1. No one ever talked about the underlying norms. What those cases involved in the background was an issue about foreign cube cases, generally speaking. Kiobel was a foreign cube case. What I mean by that is foreign plaintiffs, foreign defendants, actions taking place entirely outside the United States. And I think that one of the arguments in Kiobel for example, the UK and Netherlands filed a brief that said you should not be sitting in judgment in ATS cases over the conduct of our corporations outside the United States. And that's in fact what happened in the footnote 21 in the apartheid cases. The South African government was complaining because three of its corporations were being sued. As soon as those were dismissed, the South African government filed something with the court saying we don't have any problem with you considering the liability of your own corporations. That's exactly what the British and the Dutch said in Kiobel. If you want to apply the law of nations to your citizens, which is actually what the court statute was meant to do to begin with, that's fine. But if you try to apply it extraterritorially, then you run into some international law questions of your own about your own jurisdiction to do that. And so I think you can... Just as a good example... Are you saying there are no foreign policy implications in this case that might be weighed by policymakers rather than by judges? Well, I think first of all, you heard from my... I mean, I don't think that's... I mean, that would be hard to say, right? The government has never... the United States government nor the Chinese government has ever raised any objection in this case. We have the United States government here before us. But they haven't raised one case specific foreign policy problem. What they've said is they don't like... Okay, so you don't think there are any foreign policy implications that maybe belong to policymakers? Well, I think... I think the founders in passing the Alien Tort Statute understood very well that handling law of nations issues raises some foreign policy related questions. And I would also say that those questions were much more extreme and much more fraught in 1789 than they are in 2026. In 1789... The Bradford case is a perfect example. In that case, Attorney General Bradford said to the British plaintiffs or claimants, I have no doubt that there's a claim that you can bring under the Alien Tort Statute for what happened in Sierra Leone in the middle of a war between France and England. And so what the founders understood was that the way to handle that was not to ignore the fact that there are problems here. No matter how we decide this case, there are going to be foreign policy issues. Either France is going to be unhappy with us or England is going to be unhappy with us. Their answer to that, and it's an answer that hasn't changed yet, is you apply the rule of law. You decide the law of nations decision. And all the pirate cases... Can I ask you a question? I want to ask you a version of the question that the Chief Justice asked Mr. Gannon. And that has to do with the puzzle of this case, which is the post-eerie world when the Alien Tort Statute was enacted in the pre-eerie world. So we have a jurisdictional statute that presupposes the ability of federal courts to recognize common law actions that come from the general law. At the time, I mean, so I think this is the rationale for recognizing those that were recognized by courts at the time the ATS was enacted. At the time, you know, there were the Blackstone 3 and maybe something else. But since then, we've said courts don't do that anymore. And that's partly a function of eerie. That's partly a function of our recent line of cases talking about the separation of powers and this being Congress's job. So if the ATS is a jurisdictional statute that presupposes jurisdiction over causes of action that at the time we recognized courts had the power to recognize, what do we make of that now that it's a jurisdictional statute giving federal courts jurisdiction over something that we say courts generally lack the power to do? Well, first of all, I think that if Congress gives you the power to do that, then you have the power to do that. So you take the ATS as a grant of authority and not just a jurisdictional statute? I didn't take it as a grant of authority, and I think that's what Sosa said. Sosa said that notwithstanding the exact point that you made about eerie, because they discussed eerie. They discussed Bivens. They discussed a different attitude towards implied rights of action and the authority of the courts to do that. I think what Sosa said, almost in so many words, is that the federal courts have not lost their capacity to handle tort cases for violations of the law of nations. And that's what this statute says the courts can do. And it was not merely a jurisdictional statute in the way we understand it in the sense that you have to wait for further... But Sosa didn't extend beyond the Blackstone III. Well, but it did in the sense that it didn't find that the particular claim in Sosa was valid under its test, right, what Sosa said. And actually Sosa cited to Fulardiga and Marcos and human rights cases as being the kinds of cases that would be subject to future claims. I think there's no doubt reading that opinion that torture and extrajudicial killing and disappearance, the claims that were litigated in Marcos to judgment would be among the claims that would fit the historical paradigm test. That they clearly are supported by the same level of evidence and the same definiteness and the same acceptance internationally as the torts that the founders were talking about. And so I don't think there's any way to read Sosa without understanding it as being the... giving the ability for courts to do what they have done since, right, in terms of recognizing at least certain torts. Mr. Hoffman, can I follow up on Justice Gorsuch's question and your point about the four and cubed cases? It seems to me what the government is saying, and I just want to get your reaction to it, is that aiding and abetting liability presents the same concerns as what you described as the four and cubed cases because it's necessarily going to require proof or get into the actions of foreign officials against foreign citizens in foreign countries. Can you respond to that? Yes. Two points I would like to make. One is that the reason that the Jessner court, at least on the face of it, had a categorical rule about foreign corporations was a long history of actual conflict. I mean, we had many protests. They were all cases that didn't really have much of a connection to the United States. In Kiobo, it was the existence of a shareholder office in New York. That was the only one that was outside the country. And so I think that level of evidence might support a categorical rule, but generally I think so, except who was talking about particular issues. And I think as... Sorry, if I could focus my concern. Mike, the government raised the point that aiding and abetting will present the same kinds or very close to the   true in most cases. You just have a specific response. But the real difference to that is that in this case is a good example of that. We are talking in this case about the actions of a United States citizen that has committed actions on U.S. territory that have led to the harms that are covered by this statute. What the government is saying basically would wipe out all international human rights cases or pretty much most of them, right, because all of them have to do with that. And so what they're saying is that if the case involves human rights violations by someone outside the United States, well then that raises foreign policy issues. I think Congress has pretty conclusively rejected that argument. In the Torture Victim Protection Act, not only do they allow for these kinds of cases, they specifically make it extraterritorial and they cover the human rights violations committed by foreign officials on their territory. On the TVPA, what do you make of the fact that aiding and abetting is not part of the TVPA? Well, I think it is. It's not explicit. Central Bank says that's a problem. I guess the question is what Central Bank means, right? In Central Bank itself, the court was rejecting a presumption in favor of aiding and abetting liability and rejecting it. It wasn't creating a presumption against aiding and abetting liability. I think what the analysis in Central Bank was, they went through the text, the statutory context, the fact that in other securities laws explicit causes of action did not include aiding and abetting liability. What our position is, is that Central Bank says you look at the text, the statutory context, the legislative history, if it's appropriate to look at that, and that gets you your answer. The real issue is what is congressional intent? The Senate report says liability will extend to those who ordered, abetted, or assisted torture. You can't get any plainer than that from Congress. They didn't know about Central Bank in 1992 because Central Bank wasn't decided until 1995. I'm a little bit confused. Are you saying that the TVPA language itself includes aiding and abetting, or are you saying that aiding and abetting functions on top of the TVPA language? What our position is, section 2 of the TVPA says that an individual who subjects another person to torture is liable under the TVPA. Our position is that subjects under the ordinary meaning of the term subjects, first of all, applies to our case. Our case is a case that fits the Nuremberg legal model, which is identifying people for their persecution and torture. The Eisenach case is exactly that case, where the defendant came up with lists of communists for killing. In this case, what Cisco did was create this elaborate surveillance system to find Falun Gong members so that they could be detained and tortured. I guess what I don't understand is when you look at this language, subjects to torture, do you think that the defendants just fit that language, or do you think that there's an extra step necessary that has to do with aiding and abetting liability to get to that result? Number one, we do think that the language of the statute applies to the allegations in this case as to this defendant. We think the TVPA on its terms, based on its text, applies. We also think, more broadly, that aiders and abettors under international law, particularly with respect to torture and extrajudicial killing, are people who knowingly provide assistance that has a substantial effect on the commission of the crime. We think that language fits within the term subject. We would say that, at least with respect to torture and extrajudicial killing, because that's all that's involved in the TVPA, that that language includes the international idea of aiders and abettors. We think that's exactly what Congress had in mind, that's what the legislative history indicates, and there's nothing to indicate that even the other side agrees that subjects mean something more than the direct torture, right? Because they agree that command responsibility is in there, and command responsibility, it's an international doctrine, just like aiding and abetting liability. Aiding and abetting liability is as established as command responsibility, and command responsibility doesn't have as close a connection or as difficult requirements for liability as aiding and abetting does. And for command responsibility, you have to know or should have known. You don't have to have ordered anything, but you have to have some knowledge that people who are in the chain of your command are committing violations, and you don't do enough about it, or you don't do anything about it. I'm sorry, you want to finish? Back to the ATS and the relationship between suits under that statute and the foreign policy interests of the United States. Suppose that the United States files a statement that says, on balance, we think that this lawsuit is inconsistent with, is not in the best interest of the United States foreign policy. Is that the end of the matter? I don't know if it's the end of the matter, but I think that the courts have treated U.S. statements of interest in these cases as giving them great weight, which is what I think this court has said they're supposed to get. And I think they would be giving great weight. I've been involved in cases where the cases... What does it mean to give it great weight? Does that mean the court says, well, okay, that's too conclusory? Now explain exactly why. I think the court has within its discretion to say that your statement is too conclusory. And if the statement is, the reason we think there are foreign statements of interest in these cases is because it's not appropriate foreign policy. I think what they'd have to say is... You want a district judge to say, in my judgment, you do not have a sound basis for concluding that this would be contrary to the best interest of the United States? I think there's going to be very limited circumstances where a district judge could say that. I think if in fact... Okay, I understand the position. You've been making two arguments that are not necessarily consistent regarding the meaning of the ATS. And one has to do with the original meaning, the original understanding of the statute. One has to do with SOSA. Which one is it? Well, I think what SOSA did was interpret the meaning of the Alien Tort Statute for the modern Law of Nations. I think that's what SOSA did. I think what it tried to do... So that's not the original meaning? Well, I think what SOSA interpreted it as the original, at least as parts of it, of the original meaning. One of them being that no further action by Congress was necessary for the courts to entertain claims for torts committed in violation of the Law of Nations. Well, it's arguably inconsistent with the original understanding for at least two reasons. One has to do with the way the role of federal courts was understood before Erie. The other is something that Mr. Gannon referred to, which was the understanding of the nature of the Law of Nations at the end of the 18th century. Was it the same as it is today? I think the Law of Nations has evolved. I think it's now commonly understood to be customary international law. That's what we call it. I think that the mechanism of the creation of customary international law has somewhat changed in terms of the more multilateral treaties and that kind of thing. But I think it's the same Law of Nations. I don't think it's a different Law of Nations. I don't think that it has changed to the point where it is not the same thing that the founders were talking about. Do you think that the understanding of public international law today is the same as the understanding of the great international law treatise writers that were influential at the end of the 18th century? Is it consistent with Grotius and consistent with Vattel? Well, I think actually that our interpretation, or this court's interpretation really, was based on the obligations of Vattel, for example, which focused on our obligation to police our own citizens' conduct, for example, or things that happened within the U.S. territory that violated the Law of Nations, or not to give safe haven for people that came... Well, it was, as to the torts that Blackstone singled out, and maybe as to some others, but as to human rights violations committed by foreign nations with respect to their own people on their own territory. Was that considered to be within the scope of the Law of Nations at that time? No. It's clearly that international law has changed, and as Sosa recognized, the modern Law of Nations, it concerns itself with precisely those questions. That's the whole basis for ProLatica. That's what the Congress said should continue when it passed the Torture Victim Protection Act. In order to enforce at least two of those norms, but saying at the same time that the Alien Tort Statute performs many important functions and should continue, and endorsing the ProLatica view of what the Alien Tort Statute should be used for. Mr. Hoffman, can I just take you back to something you explored with Justice Kavanaugh, which is whether or not aiding and abetting liability presents the same concerns as the foreign cubed cases? I've been puzzling over that, and I think the government's view assumes that it would because the litigation involving aiding and abetting would necessarily call into question the underlying violation by the foreign country. You would have evidence about the actual torture, etc. I guess what I'm wondering is whether that's necessarily the case. You suggest that the claim at issue here really is about what Cisco did, about Cisco's acts here in the United States with the creation of this software and the extent to which it did so under China's direction and to facilitate whatever it was that China was doing. So I suppose you could have a world in which Cisco even concedes for the purpose of litigation that those things happened in China, and the whole litigation is really just about its own participation. In that case, would it raise the foreign policy concerns that the United States is talking about? We don't think so, and we also think that aiding and abetting as a concept doesn't necessarily implicate foreign policy at all. For example, say the Iranian regime is overthrown, and it turns out that an American company helped the Iranian regime identify protesters so that they could be executed summarily. And the parents of those teenagers that were executed come to this country and say, that corporation helped kill our children. Would we really say that they don't have a claim here because of foreign policy? There's no foreign policy implication. It's completely consistent with U.S. policy. And in fact, in this case, the United States government has condemned all the things that we have said about what the Chinese government does to the Falun Gong, every single one of them. Thank you, Counsel. Justice Thomas? When we had Central Bank appear, the point that, of course, that is a securities case, but it makes the point that there was no general background common law rule as to aiding and abetting in tort cases. If that is the case, how does that affect aiding and abetting in 1789 on the three categories that we indicated in SOSA? Well, what I would say to that is that as your decision in Twitter laid out in terms of the long history of aiding and abetting in the criminal context, there's an equally long history of accessorial liability and aiding and abetting liability in the context of the law of nations, which, from our standpoint, in terms of enforcing this statute, is different from anything that existed in terms of civil aiding and abetting liability. What we're saying is that Congress said that we could have a tort action if we had a violation of the law of nations. Aiding and abetting, torture and extrajudicial killing and disappearance under customary international law, and I don't think it's disputed by the other side that it is a violation, fits what Congress said we could get, and that SOSA said that unless there's some reason that we shouldn't be able to go forward, we have that claim. And we're saying that there's no categorical reason why this aiding and abetting claim, which focuses on U.S. citizens acting from U.S. territory, raises the kind of issues that this court recognized in Jessner, based on a long history of protest and the fact that the cases didn't have much to do with the United States. So we have to actually go beyond the common law itself? Well, no. I mean, the law of nations was part of the common law. That was the understanding at the time. That was probably part of why, you know, the Alien Tort statute was passed the way it was. The law of nations was understood to be part of the common law that we inherited from England. And you have cases from the beginning of the Republic throughout, the Paquete to Havana, and, you know, dealing with the capture of fishing vessels during a war. They're saying that courts had the responsibility to identify and apply the law of nations. Even in 1900, the courts were saying that. And the court has consistently said, over time, that the law of nations, and also customary international law, is part of our law to be applied. Congress can withdraw this authority, as it was at the time. If Congress thinks that the concerns that have been raised by the chamber and other amici and by the United States is problematic, Congress can do away with it. And just say, no, you know, we're out of that business. But they've never said it. And, in fact, the only time Congress has said anything is they've said, we really like Philadelphia. We really think that's a good precedent. They say it in the Senate report for paragraphs. And so, in terms of what Congress has decided, in terms of the tradeoff, I think both in 1789, when it was even more fraught, and today, what these statutes mean is that we do have a commitment to enforcing international law, at least in some limited extent. Wouldn't it actually work better the other way if Congress actually added aiding and abetting? It would certainly mean that we wouldn't have to debate that issue anymore. But I don't think they have to. And I guess our point about Central Bank, at least as it applies to the TVPA, I mean, I don't know how you apply Central Bank to the first statute that Congress ever passed, in terms of implying what they thought about it. But for the TVPA, our point is that Central Bank doesn't say that you have to use magic words, or that you have to use that word. What you have to find out is what did Congress intend? Congress said that it intended for people who aided and abetted, or at least abetted and assisted, to be liable under the statute. And it was enforcing international law, which also applied to aiders and abetters. Thank you, Justice Alito. Justice Sotomayor. Justice Kagan. Justice Gorsuch. Justice Kavanaugh. Justice Jackson. Thank you, Counsel. Thank you, Your Honor. Rebuttal, Mr. Shanmugam. Thank you, Mr. Chief Justice. Judge Friendly famously described the ATS as a legal loan grin. And in SOSA, the Court recognized that the ATS was jurisdictional, but that Congress didn't intend it to be stillborn. And hence, it created a cause of action for the norms that the first Congress expected to be recognized. But over Justice Scalia's objection, the Court then went further. It went on to permit judicial lawmaking, the recognition of new causes of action as a matter of federal common law for violations of modern international law. And it's that methodology that we believe is invalid and that the Court should now reject. And that is because far from engaging in strict judicial doorkeeping, the lower courts have uncritically recognized a wide range of claims to be actionable, including aiding and abetting claims, often over the objections of foreign governments, as we discussed at page 35 of our brief. And even in the wake of this Court's most recent decisions, the plaintiff's bar has been adept at taking extraterritorial allegations against American companies and repackaging them as allegations concerning aiding and abetting conduct that took place in the United States. That methodology has proven to be unworkable, and as this Court did in Edwards v. Vannoy and Loper-Bright when confronted with similarly unworkable methodologies, this Court should now reject it. But even if the Court doesn't go that far, it should still reverse. We take the point that the aiding and abetting analysis should occur on a norm-by-norm basis, at least at the first step of SOSA. But any aiding and abetting claim, apart from the three core offenses, will ultimately still fail. And that is regardless of whether you conceive of aiding and abetting as a discrete cause of action or merely a question concerning the scope of the cause of action. If it is the former, we believe that the recognition of a cause of action, regardless of the norm, will fail at step two of SOSA for the reasons given by Judge Christian in her dissent below the foreign policy concerns that we've discussed today. But if you think it's a question concerning the scope of the cause of action, then you have to look to principles of domestic law. That is the teaching of Kiobel in particular, and I think that is also the teaching of Justice Sotomayor's dissent in Jesner. And if you're looking to domestic law, the place to look is central bank, and not just to central bank as a rule of interpretation, but as Justice Thomas said, as resting on a fundamental premise, namely that aiding and abetting liability was not available at the common law. In the words of the D.C. Circuit in the Halberstam case, the common law largely confined aiding and abetting liability to isolated acts of adolescence in rural society. There was certainly no broad norm to that effect. Obviously, Cisco vigorously disputes the allegations in this particular case. It complied with all applicable United States laws, particularly with regard to the provision of technology to China. But we're here on a motion to dismiss. This is ultimately a legal question, and Congress can, in this context, as in others, create a cause of action if it wishes to do so. Thank you. Thank you, counsel. The case is submitted.